IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| JENNIFER BEXLEY, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | )  CIVIL ACTION 24-0252-WS-M |
| | ) |
| BASS UNDERWRITERS, INC., | ) |
| | ) |
|     Defendant. | ) |

## ORDER

This matter is before the Court on the defendant's motion for summary judgment. (Doc. 30).  The parties have filed briefs and evidentiary materials in support of their respective positions, (Docs. 30-31, 33-34, 39), and the motion is ripe for resolution. After careful consideration, the Court concludes the motion is due to be denied.

## BACKGROUND

According to the complaint, (Doc. 1), the plaintiff was hired by the defendant as an assistant underwriter in May 2015.  In approximately May 2018, she was promoted to the position of commercial insurance underwriter.  In late 2021, she was placed on probation for not meeting her sales goals but was removed from probation in February 2022 after her numbers increased.  The plaintiff became pregnant and was on maternity leave beginning December 5, 2022 and ending January 30, 2023.  On February 8, 2023, the plaintiff was placed on a month-to-month probation for not meeting her goals.  The plaintiff then informed her supervisor that she would be unable to meet agents in person because she was breastfeeding.  In February 2023, the plaintiff informed two superiors that her husband was being transferred to North Carolina.  On February 16, 2023, the defendant informed the plaintiff that her employment was being terminated immediately due to her move to North Carolina.

In addition to the plaintiff, the key figures in this case include:  Craig Perloff, the Mobile branch manager and the plaintiff's immediate supervisor;[1] Jim Phelps, the defendant's national marketing director;[2] Bill Turgeon, the defendant's chief underwriting officer and Perloff's direct supervisor;[3] and Sarah Rodriguez of the defendant's human resources department and, since late January 2022, its human resources manager.[4]

The complaint asserts three claims, all under Title VII.  Count I alleges that the defendant's termination of the plaintiff constitutes unlawful discrimination on the basis of sex and/or pregnancy.  Count II asserts that the defendant placed the plaintiff on probation, and then terminated her, in retaliation for engaging in protected activity.  Count III complains that the defendant unlawfully failed to accommodate the plaintiff's breastfeeding.

## DISCUSSION

Summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial."  *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991).  The moving party may meet its burden in either of two ways: (1) by "negating an element of the non-moving party's claim"; or (2) by "point[ing] to materials on file that demonstrate that the party bearing the burden of proof at trial will not be able to meet that burden."  *Id*.  "Even after *Celotex* it is never enough simply to state that the

---

[1] (Doc. 30 at 6; Doc. 33-1 at 1).

[2] (Doc. 30 at 6; Doc. 31-3 at 1).

[3] (Doc. 33-3 at 2-3; Doc. 39 at 3).

[4] (Doc. 31-4 at 1).

non-moving party cannot meet its burden at trial." *Id*.; *accord United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1438 n.19 (11th Cir. 1991) (en banc).

"If the party moving for summary judgment fails to discharge the initial burden, then the motion must be denied and the court need not consider what, if any, showing the non-movant has made." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir. 1993); *accord Mullins v. Crowell*, 228 F.3d 1305, 1313 (11th Cir. 2000); *Clark*, 929 F.2d at 608.

"If, however, the movant carries the initial summary judgment burden ..., the responsibility then devolves upon the non-movant to show the existence of a genuine issue of material fact." *Fitzpatrick*, 2 F.3d at 1116. "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment." *Clark*, 929 F.2d at 608 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted); *see also* Fed. R. Civ. P. 56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may … consider the fact undisputed for purposes of the motion ….").

In deciding a motion for summary judgment, "[t]he evidence, and all reasonable inferences, must be viewed in the light most favorable to the nonmovant …." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003); *accord WBY, Inc. v. City of Chamblee*, 15 F.4th 1242, 1258 (11th Cir. 2025). "Therefore, the [non-movant's] version of the facts (to the extent supported by the record) controls, though that version can be supplemented by additional material cited by the [movants] and not in tension with the [non-movant's] version." *Rachel v. City of Mobile*, 112 F. Supp. 3d 1263, 1274 (S.D. Ala. 2015), *aff'd*, 633 Fed. Appx. 784 (11th Cir. 2016).

There is no burden on the Court to identify unreferenced evidence supporting a party's position.[5] Accordingly, the Court limits its review to the exhibits, and to the

---

[5] "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by ... citing to particular parts of materials in the record," and "[t]he court need consider

specific portions of the exhibits, to which the parties have expressly cited.  Likewise, "[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment."  *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995); *accord Gennusa v. Canova*, 748 F.3d 1103, 1116 (11th Cir. 2014).  The Court accordingly limits its review to those arguments the parties have expressly advanced.

## I. Termination Based on Sex/Pregnancy Discrimination.

"It shall be an unlawful employment practice for an employer ... to discharge any individual, or otherwise to discriminate against any individual with respect to his ... terms, conditions, or privileges of employment, because of such individual's ... sex ...." 42 U.S.C. § 2000e-2(a)(1).  Pursuant to the Pregnancy Discrimination Act ("PDA"), "[t]he terms 'because of sex' or 'on the basis of sex' include ... because or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes ... as other persons not so affected but similar in their ability or inability to work ...."  *Id*. § 2000e(k).  "[L]actation is a related medical condition and therefore covered under the PDA."  *Hicks v. City of Tuscaloosa*, 870 F.3d 1253, 1259 (11th Cir. 2017).

The Eleventh Circuit recognizes three means by which a plaintiff asserting a claim of discrimination under Title VII may survive a properly supported motion for summary judgment:  (1) by presenting so-called "direct evidence" of discriminatory intent; (2) by presenting circumstantial evidence, and countering the defendant's evidence of a legitimate, nondiscriminatory reason for its action, through the burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); and (3) by presenting a "convincing mosaic of circumstantial evidence that warrants an

---

only the cited materials ...."  Fed. R. Civ. P. 56(c)(1)(A), (3); *accord HRCC, Ltd. v. Hard Rock Cafe International (USA), Inc*., 703 Fed. Appx. 814, 817 (11th Cir. 2017).

inference of intentional discrimination."  *Lewis v. City of Union City*, 918 F.3d 1213, 1220 & n.6 (11th Cir. 2019) (en banc) (internal quotes omitted); *accord Jiminez v. U.S. Attorney General*, 146 F.4th 972, 996-97 (11th Cir. 2025).  The plaintiff does not claim to have direct evidence that her termination was based on sex/pregnancy discrimination.

The defendant argues the plaintiff cannot establish a *prima facie* case under *McDonnell Douglas*.  (Doc. 30 at 9-10, 14-15).  A *prima facie* case under *McDonnell Douglas* in the termination context generally requires evidence either that a similarly situated comparator outside the protected category received more favorable treatment[6] or that the terminated plaintiff was replaced by someone outside the protected class.[7]  The plaintiff does not purport to have such evidence.

Instead, the plaintiff relies on the "convincing mosaic" method.  "Our precedent ... makes clear that a plaintiff who cannot establish the *McDonnell Douglas* prima facie case is entitled to a full review under the convincing mosaic standard."  *Ismael v. Roundtree*, 161 F.4th 752, 761 (11th Cir. 2025).  This means, as the defendant recognizes, (Doc. 30 at 12), that the absence of a similarly situated comparator is of no moment.  *Tynes v. Florida Department of Juvenile Justice*, 88 F.4th 939, 946 n.2 (11th Cir. 2023); *accord Poer v. Jefferson County Commission*, 100 F.4th 1325, 1339-40 (11th Cir. 2024) (describing *Jenkins v. Nell*, 26 F.4th 1243 (11th Cir. 2022)).

According to the defendant, under the convincing-mosaic standard the plaintiff "must" point to evidence of "'suspicious timing, ambiguous statements, systematically better treatment of similarly situated employees, or evidence that the employer's justification for its action is pretextual.'"  (Doc. 39 at 2 (quoting *Jiminez*, 146 F.4th at 997)).  While all these are appropriate categories of evidence, they are not, as the defendant posits, exhaustive.  On the contrary, "[a] plaintiff proving her case through the convincing mosaic standard may point to *any* relevant and admissible evidence."  *Tynes*,

---

[6] *E.g., Lewis*, 918 F.3d at 1220-21.

[7] *E.g., Cuddeback v. Florida Board of Education*, 381 F.3d 1230, 1235 (11th Cir. 2004); *accord Morris v. Emory Clinic, Inc*., 402 F.3d 1076, 1082 (11th Cir. 2005).

88 F.4th at 946 n.2 (emphasis added). "Employees are not limited in the kinds of circumstantial evidence they may present," and the list the defendant says is exclusive is in fact "nonexclusive." *Berry v. Crestwood Healthcare LP*, 84 F.4th 1300, 1310 (11th Cir. 2023).[8]

In any event, and as discussed below, the parties' presentations contain copious indications of suspicious timing, ambiguous statements, and pretextual justifications, more than sufficient to raise a reasonable inference that the defendant unlawfully discriminated against the plaintiff on the basis of sex/pregnancy by terminating her employment.

The plaintiff announced her pregnancy in early July 2022. (Doc. 31-1 at 104). She was given eight weeks of maternity leave, beginning December 5, 2022. (*Id*. at 105). The plaintiff was not on probation when she began her maternity leave. (Doc. 1-2 at 2). She returned from maternity leave, as scheduled, on January 30, 2023. (*Id*.; Doc. 31-1 at 105). In early February, the plaintiff was placed on a month-to-month probation for not meeting her goals. (*Id*. at 39-41; Doc. 1-2 at 2). Part of her probation required the plaintiff to visit agents in person; she immediately called Perloff and told him that would be an issue because she was exclusively breastfeeding. (Doc. 33-1 at 21-22, 37-38). The plaintiff was terminated on February 16, 2023. (Doc. 33-1 at 22).

It need hardly be said that this timing looks suspicious. The plaintiff was suddenly placed on probation about a week after returning from maternity leave, and she was suddenly fired about a week after announcing she was breastfeeding (and barely two weeks after returning from maternity leave). *Cf. Hicks*, 870 F.3d at 1257 (the defendant's reassignment of the plaintiff, eight days after she returned from maternity leave, was

---

[8] *Jiminez* did not use the mandatory "must" that the defendant attributes to it; instead, the panel said only that a plaintiff "may" point to such matters. 146 F.4th at 997. Even absent such language, *Jiminez* could not have established an exclusive list, since it was expressly describing *Jenkins* -- an opinion explicitly stating that the listed categories of evidence exist "among other things." 26 F.4th at 1250.

evidence supporting an inference that the reassignment was discriminatorily based on her pregnancy).

The defendant's efforts to allay this suspicion only compound its difficulty. The defendant identifies its legitimate, nondiscriminatory reason for firing the plaintiff as "her abject failure to meet financial performance requirements for the vast majority of her employment as an Underwriter." (Doc. 30 at 10; *accord id*. at 14-15). The defendant stumbles out of the gate, since its briefing offers no citation to any evidence that the plaintiff was terminated for this reason. To meet its intermediate burden under the *McDonnell Douglas* paradigm, "the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the [adverse employment decision]." *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 255 (1981). "An articulation [of a legitimate, nondiscriminatory reason for the decision] not admitted into evidence will not suffice." *Id*. at 255 n.9. "The defendant cannot testify in abstract terms as to what might have motivated the decision-maker; it must present specific evidence regarding the decision-maker's actual motivations with regard to each challenged employment decision." *Walker v. Mortham*, 158 F.3d 1177, 1181 n.8 (11th Cir. 1998); *accord Ossmann v. Meredith Corp*., 82 F.4th 1007, 1016 (11th Cir. 2023).

The parties are not proceeding under *McDonnell Douglas*, but in every case the initial burden on motion for summary judgment lies with the defendant, by resort to record evidence, either to affirmatively negate an element of the plaintiff's case or to demonstrate that the plaintiff cannot at trial present evidence to support an element of her case. The defendant fails to explain how, without first offering evidence of what actually motivated its decisionmaker (as opposed to what plausibly could have motivated its decisionmaker), it can shift any burden to the plaintiff under *Celotex* to respond to its motion with a convincing mosaic of circumstantial evidence that she was terminated based on sex/pregnancy discrimination.

Nevertheless, the plaintiff has responded to the motion for summary judgment, and in doing so she has supplied evidence of the defendant's asserted nondiscriminatory reason for firing her. (Doc. 34 at 6). Turgeon testified that the "official reason" for the

plaintiff's termination was "[l]ack of production." (Doc. 33-3 at 48). The parties do not address who decided to terminate the plaintiff, but the Court assumes for present purposes that Turgeon's status as the supervisor of the plaintiff's supervisor supports a reasonable inference that he either was the decisionmaker or has personal knowledge of the decisionmaker's reason for the decision.

The "lack of production" on which the defendant relies is the plaintiff's "abject failure to meet financial performance requirements." (Doc. 30 at 10). "Plaintiff's termination was based solely on years of failing to meet financial performance requirements." (*Id*. at 13). "Defendant terminated Plaintiff based on her failure to meet financial performance requirements for the majority of the time she was employed by Defendant." (*Id*. at 16). That "the Plaintiff failed to meet Defendant's minimum financial performance requirements across multiple years" constitutes a "legitimate and non-discriminatory" reason for her termination. (*Id*. at 14-15).

The defendant identifies the "minimum financial performance requirement" throughout the plaintiff's time as an underwriter as $15,000 in monthly net revenue or $180,000 in annual net revenue. (Doc. 30 at 3-4, 11). The defendant offers evidence that the plaintiff never met this annual figure and met this monthly figure only about one-third of the time. (Doc. 31-1 at 66-102; Doc. 31-3 at 1, ¶ 11; Doc. 31-4 at 1-2, ¶¶ 8-19).

The plaintiff argues that there was no minimum financial performance requirement at all, only a lower, $10,000 monthly threshold for receiving a commission. (Doc. 34 at 7). She relies on the deposition of Turgeon, in which he says just the opposite: the minimums "are the minimum numbers to sustain yourself," "[t]he minimum in order to ... continue your position," and "the minimum production to continue on as a broker." (Doc. 33-3 at 4-5). The plaintiff cites as well to her own deposition, which does not stand for the stated proposition; on the contrary, she confirmed that the defendant's expectation of underwriters when she became one in May 2018 was $100,000 in monthly premium and that the standard changed effective July 2021 to $15,000 in monthly net revenue. (Doc. 31-1 at 40; Doc. 33-1 at 5-6, 10-11). This is consistent with Turgeon's testimony. (Doc. 33-3 at 4-5).

For purposes of the instant motion, it is thus undisputed that the defendant maintained minimum financial performance requirements throughout the plaintiff's employment as an underwriter. The defendant's motion assumes that the relevant minimum was always $15,000 in monthly net revenue, but Turgeon's testimony, as well as other evidence, makes clear that the relevant minimum between May 2018 and June 2021 was $100,000 in monthly premium. This means that the defendant, in criticizing the plaintiff's production during this period, has employed the wrong metric. It may well be that the plaintiff's performance was comparably deficient under either measure,[9] but the defendant cannot by its error compel the Court to scour the record to identify clues and then stitch together a picture of the plaintiff's performance under a monthly premium standard. Nevertheless, for present purposes the Court assumes for argument that the plaintiff's performance was comparable using either metric.

According to the defendant's evidence, the plaintiff's underperformance in net revenue looks like this:

| Year[10] | Minimum | Actual | % of Minimum | Months Below Minimum |
|------|-----------|--------------|--------------|----------------------|
| 2018 | $120,000 | $110,679.97 | 92.2 | 4 of 8 |
| 2019 | 180,000 | 158,100.59 | 87.8 | 7 of 12 |
| 2020 | 180,000 | 118,735.02 | 66.0 | 12 of 12 |
| 2021 | 180,000 | 138,525.71 | 77.0 | 10 of 12 |
| 2022 | 165,000 | 163,605.88 | 99.2 | 5 of 11 |

This chart shines a spotlight on the defendant's awkward position. Year after year, the plaintiff failed to meet the annual net revenue minimum, yet the defendant maintained

---

[9] For example, the defendant asserts the plaintiff did not generate $15,000 in net revenue for November 2018, and the same document confirming this assertion also reflects that the plaintiff did not generate $100,000 in premium for that month. (Doc. 31-1 at 67).

[10] Turgeon expressed the net revenue expectation as a monthly requirement, but the defendant in brief emphasizes annual figures (expected and actual), (Doc. 30 at 3-4), validating this as an appropriate perspective.

her employment.  Over 2020 and 2021, the plaintiff fell short in 22 out of 24 months[11] and generated barely 70% of the minimum net revenue, yet she remained employed.  In 2022, the plaintiff exceeded the minimum for six consecutive months from February through July, and even though her production slipped in August through November (the second half of her pregnancy), she had by far her best year ever and was within a hairsbreadth of meeting the annual minimum for the first time; indeed, for the final ten months before her maternity leave, the plaintiff's cumulative total *exceeded* the minimum. The defendant asserts that the plaintiff's 2022 performance was the last straw in a long history of "abysmal job performance," (Doc. 30 at 10), prompting the defendant to terminate her on that basis, but the numbers above -- especially in light of the suspicious timing of the decision -- could lead a reasonable jury to reject that explanation.

It gets worse.  The defendant insists that the plaintiff's unacceptable performance includes low numbers in December 2022 and January 2023.  (Doc. 30 at 3-4).  Because the plaintiff was on maternity leave all but six days of this period,[12] a reasonable inference is that the defendant penalized the plaintiff for not producing sufficient net revenue while on pregnancy-related leave.

And worse still.  The defendant insists that the plaintiff's performance issues "continued after her maternity leave," (Doc. 30 at 11), yet the only evidence cited by the parties is that, when she was fired, the plaintiff's numbers for February (the only month she worked after maternity leave) were on track to exceed the net revenue minimum. (Doc. 33-1 at 33).  A reasonable inference is that the defendant, in attempting to justify its termination of the plaintiff, relied on an assessment of her recent performance that it knew or should have known to be false.

The defendant ignores all the foregoing and instead devotes much of its argument to substantiating the existence and seriousness of the plaintiff's historical failure to meet

---

[11] From September 2019 through January 2022, the plaintiff fell short in 27 out of 29 months.

[12] December 1-4, 2022 and January 30-31, 2023.

net revenue requirements.  According to the defendant, the plaintiff was placed on "written probation" three separate times:  February 2021, December 2021, and February 2023.  (Doc. 30 at 4, 8-9, 11; Doc. 31-3 at 2, ¶ 24).  The plaintiff, however, testified she was placed on probation only twice, (Doc. 33-1 at 9), and on motion for summary judgment, her version controls.  This eliminates the alleged February 2021 probation from consideration.[13]

The plaintiff's December 2021 written probation is reflective of her then-existing performance issues, but it does not meaningfully suggest that her February 2023 probation (and fast-following termination) were also motivated by performance issues.  As noted above, the plaintiff in 2021 produced only 77% of expected net revenue,[14] while in 2022, she produced over 99% of expected net revenue prior to her maternity leave (and over 100% for the final ten months before such leave).

As the plaintiff notes, several differences between the December 2021 and February 2023 probations (above and beyond the suspicious timing of the latter) affirmatively suggest the February 2023 probation was not in fact based on financial performance issues.  First, as discussed above, is the stark difference in production numbers preceding the two probations.  Second, while the December 2021 probation was announced by thoughtful written communications carefully addressing specific issues with the plaintiff's numbers, (Doc. 31-1 at 63-65), the defendant has identified no similar documentation of the reasoning behind the February 2023 probation.  Third, while the December 2021 probation was accompanied by affirmations of confidence in the plaintiff's ability to succeed (even though her numbers were then much lower),[15] the

---

[13] Even though the defendant asserts the plaintiff was placed on "written probation" in February 2021, it has cited no documentation of such a probation.

[14] For the eleven-month period on which probation was based, the plaintiff's net revenue production was 77.7% of the minimum expectation.

[15] "[T]he team feels strongly that you have the ability to be successful with Bass and hope to see great improvement."  (Doc. 33-5 at 1).  "Jenny, your time at Bass does not go unnoticed, which is why the abovementioned should be attainable."  (*Id*. at 3).

defendant's approach in February 2023 (after the plaintiff had shown great improvement) appears to have been simply demanding and peremptory. Fourth, while the December 2021 probation was for a specific, extended period (90 days), providing clarity regarding its length and adequate time to address identified issues, the February 2023 probation was made month-to-month, without any end date or off ramp. (Doc. 33-1 at 39). Fifth, while the December 2021 probation provided clear expectations for improvement, the February 2023 probation identified no goals to be achieved. (*Id.*).

In a related vein, the defendant stresses that the plaintiff was well aware of her shortcomings because: (1) she "was given verbal and written warnings"; (2) she received "repeated counseling"; (3) she received monthly production reports reflecting her net revenue production; and (4) she completed self-evaluations in which she assessed that she "needs improvement." (Doc. 30 at 4, 12, 14). The only evidence the defendant cites in support of any verbal or written warning during the plaintiff's employment are the two December 2021 communications informing the plaintiff of her probation. The defendant cites no evidence at all regarding any counseling. All the defendant has shown, unremarkably, is that the plaintiff was aware of her production numbers and believed she should improve her decision making, planning, and organization. (Doc. 31-1 at 43-62).

The salient point of the defendant's argument is that it cannot point to a history of counseling the plaintiff or of warning her regarding the performance it says was so intolerable. It cannot point to any negative employer evaluations of the plaintiff,[16] and it cannot explain how an employee's desire to improve -- an attitude most employers would welcome -- compensates for its own failure, after December 2021, to express any dissatisfaction with the plaintiff's performance before suddenly placing her on probation and terminating her employment in February 2023. This prolonged silence preceding the plaintiff's final days of employment only strengthens the plaintiff's mosaic of evidence.

The defendant argues that, its silence notwithstanding, "during her entire time employed as an Underwriter for Bass, Plaintiff ranked dead last annually among all

---

[16] The plaintiff denies the existence of any negative evaluation, (Doc. 3-1 at 8), and the defendant essentially concedes the point. (Doc. 39 at 5).

underwriters in the Mobile, Alabama, office in terms of minimum financial performance." (Doc. 30 at 11; *accord* at 4). The evidence on which the defendant relies, however, states only that, over the almost five-year period of her employment as an underwriter, the plaintiff "typically" or "continually" ranked last. (Doc. 31-3 at 3, ¶ 34; Doc. 31-4 at 2, ¶ 20).[17] The former denotes the usual but not invariable case, and the latter denotes a repeated but not uninterrupted condition. These qualified statements are not evidence that the plaintiff ranked last in net revenue during her breakout year of 2022 but, even if they were, they fail to explain why the defendant accepted years of dead-last performance until the plaintiff, after a year in which she essentially met the minimum net revenue expectations to continue employment, took maternity leave and began breastfeeding.[18]

The plaintiff, unlike the defendant, presents evidence of what was happening as she approached maternity leave. On or about November 18, 2022 (approximately two weeks before her leave began), Perloff called the plaintiff and said Turgeon had called him to see if she had any interest in taking a position with a carrier partner, for the stated reason that it might be a better fit for her as a new mother, since it was a purely underwriter position without any sales-related role. The plaintiff responded that she was not interested and that she intended to return to her job with the defendant after her

---

[17] The defendant suggests the plaintiff admitted her perennial last-place ranking, (Doc. 30 at 4), but the cited testimony patently does not do so. (Doc. 31-1 at 24-25).

[18] In its factual summary, the defendant notes the importance of underwriters regularly conducting in-person visits with retail insurance agents in an effort to boost business. (Doc. 30 at 2). It also notes that the plaintiff's December 2021 probation required her to be physically in the Mobile office when not visiting agents but that the plaintiff was in-office only five times between June 2021 and February 2023. (*Id*. at 5). The latter statement is incorrect, as the testimony on which the defendant relies frames the relevant time period as June 2021 through December 2021, not February 2023. (Doc. 31-1 at 13). After making these factual (mis)statements, the defendant offers no argument regarding them, and the Court will not construct one on the defendant's behalf. Even had the defendant offered evidence that the plaintiff fell short in these areas during 2022 (and it has not), that would at most suggest a reason for the plaintiff's net revenue numbers; it would not, without testimony to that effect (which is missing), supply an additional legitimate, nondiscriminatory reason for her termination.

pregnancy. The plaintiff asked Perloff if he was trying to tell her something, and he said no, absolutely not. (Doc. 33-1 at 18-20, 39-40).

Turgeon denies having told Perloff the position would be a better fit for the plaintiff as a new mother, and he states he has placed a dozen employees with carriers the defendant represents, regardless of pregnancy or other protected status. (Doc. 33-3 at 37-39).[19] The plaintiff's evidence that Perloff made an explicit link between the opportunity and the plaintiff's maternal status stands unrebutted, however, and a properly functioning jury could on this evidence find that what Perloff said came from Turgeon.

The plaintiff's evidence, if accepted by the jury, would support a reasonable inference that the defendant desired to shed her as an employee due to her pregnancy and impending motherhood. Perloff's statement that he was not trying to tell the plaintiff anything would also support a reasonable inference that the defendant did not consider her performance to be grounds for imminent termination.

The plaintiff, unlike the defendant, also cites to evidence of how she was informed of her termination. On February 16, 2023, Rodriguez called the plaintiff and told her she was being terminated because the defendant was not set up for payroll in North Carolina. (Doc. 33-1 at 28). That is, even though it now insists it fired the plaintiff for chronic poor performance, the defendant initially gave the plaintiff an entirely different reason for the termination decision.

In its reply brief, the defendant changes its argument. As noted, in its principal brief the defendant explicitly wedded itself to the position that "Plaintiff's termination was based *solely* on years of failing to meet financial performance requirements." (Doc. 30 at 13 (emphasis added)). The defendant's principal brief repeatedly echoed this theme:

- "Plaintiff's termination in February 2023 was a result of Plaintiff's failure to meet performance requirements after repeated counseling, numerous opportunities to improve, and additional support from management," (*id*. at 9);

_____

[19] The defendant did not submit the deposition pages on which it relies. (Doc. 31-2; Doc. 39 at 5). However, because the plaintiff did submit those pages, the Court considers them.

- "Defendant terminated Plaintiff because of her abject failure to meet financial performance requirements for the vast majority of her employment as an Underwriter," (*id*. at 10);

- the plaintiff "cannot prove it was her pregnancy or pregnancy-related conditions, as opposed to her abysmal job performance, that was the reason for her termination," (*id*.);

- the defendant's articulated legitimate, nondiscriminatory reason for terminating the plaintiff is "that Plaintiff repeatedly failed to meet minimum financial performance requirements for nearly every year of her employment," (*id*. at 11);

- the plaintiff cannot establish a fact issue as to pretext "when faced with the overwhelming evidence that Plaintiff was not meeting financial performance requirements well before she announced her pregnancy, took maternity leave, or returned from maternity leave," (*id*. at 13);

- the defendant's articulated legitimate, nondiscriminatory reason for terminating the plaintiff is that "Plaintiff failed to meet Defendant's minimum financial performance requirements across multiple years, despite repeated counseling, numerous opportunities to improve, and additional support from management," (*id*. at 14-15);

- "Defendant terminated Plaintiff based on her failure to meet financial performance requirements for the majority of the time she was employed by Defendant." (*Id*. at 16).

In its reply brief, the defendant proposes *two* "legitimate, non-discriminatory reasons for termination.  Plaintiff continuously underperformed for years and also relocated to another state in which Defendant was not set up for business.  Both of these reasons would independently support the termination decision." (Doc. 39 at 7).  The defendant says that "[p]erformance deficiencies and unapproved relocation were not competing explanations, but distinct and independently sufficient bases for termination."

(*Id*. at 8; *accord id*. at 7).  Somewhat inconsistently, the defendant also says that "Plaintiff's unapproved relocation, *coupled with* her persistent failure to meet performance expectations, was the final and decisive factor in Defendant's business decision to terminate her employment."  (*Id*. at 6 (emphasis added)).

The defendant's threshold problem is procedural.  "District courts, including this one, ordinarily do not consider arguments raised for the first time on reply."  *Parker v. Exterior Restorations, Inc*., 653 F. Supp. 3d 1105, 1108 (S.D. Ala. 2023).  "Unless the offending party articulates an adequate reason for its failure to present in its principal brief an argument then available to it, the Court will not grant relief based on arguments first raised in reply."  *Id*.  The defendant offers no explanation for its failure in its principal brief to identify the plaintiff's move to North Carolina as a second legitimate, nondiscriminatory reason for terminating her employment.

The Court nevertheless elects to consider the defendant's argument.  First, while its principal brief explicitly confined the defendant's legitimate, nondiscriminatory reason to chronic failure to meet net revenue minimums, that brief elsewhere twice suggested the move played a role in the termination decision.  In its statement of facts, the defendant recounted its version of the move and concluded that "Defendant could not justify setting up an office in North Carolina solely for Plaintiff and, as a result, Plaintiff was subsequently terminated on or around February 16, 2023."  (Doc. 30 at 6).  In its argument section regarding the retaliation claim (not the sex/pregnancy discrimination claim), the defendant asserted that "Plaintiff's termination in February 2023 resulted from ongoing underperformance and her unapproved relocation out of state, not from any protected status."  (*Id*. at 16).

Second, the plaintiff in her opposition brief responded to the defendant's references to the North Carolina move, including by countering suggestions the move was inappropriate and motivated the defendant's adverse employment action.  (Doc. 30 at 6, 10-11, 19-20).  The rule against considering arguments first raised on reply rests largely on the need to ensure the non-movant's ability to respond to arguments without resort to additional rounds of briefing.  *E.g., Samuels v. Midland Funding, LLC*, 921 F.

Supp. 2d 1321, 1333 n.20 (S.D. Ala. 2013). When, as here, the non-movant has already addressed the newly raised argument, the wrong the rule seeks to prevent is mitigated or absent, and the rule thus need not be applied as stringently.

The defendant's second threshold problem is its failure to cite any evidence that it relied on the plaintiff's move to North Carolina as the (or a) reason it decided to terminate her. Once again, however, the plaintiff supplies the missing evidence. As noted, she has testified that she received a call from Rodriguez on February 16, who told her she was being terminated because the defendant "w[as] not set up for payroll in North Carolina." (Doc. 33-1 at 28).

The defendant's procedural victory, however, is pyrrhic. As discussed below, injecting this second asserted reason for terminating the plaintiff only strengthens her mosaic of circumstantial evidence.

First, and as noted above, informing the plaintiff that she was being terminated for her move to North Carolina, rather than for unacceptable financial performance, directly contradicts the defendant's argument that poor performance was the real reason for termination.

Second, and as noted above, the defendant cannot decide whether the plaintiff's performance and the North Carolina move were independently sufficient justifications for termination or whether the combination of both was necessary for termination.

Third, even though it was Rodriguez who told the plaintiff she was being fired because the defendant was not set up for payroll in North Carolina, Rodriguez now testifies that the plaintiff "was terminated from Bass *solely* for her continual failure to meet Bass' minimum financial performance requirements" and "was *not* terminated because of her move to the State of North Carolina." (Doc. 31-4 at 3-4, ¶¶ 36, 37, 39 (emphasis added)).

Fourth, the defendant offers varying accounts of what supposedly made the move to North Carolina problematic. Rodriguez told the plaintiff it was because the company was not set up for payroll in North Carolina. The defendant in brief argues it was because it was not legally possible for the plaintiff to write business in North Carolina.

(Doc. 30 at 6). The defendant later argues it was because the plaintiff had not sought or obtained pre-approval for the move. (Doc. 39 at 6-7). The defendant also argues it was because the move would impose "significant payroll, licensing, and compliance burdens." (*Id*.).

Fifth, there is evidence that none of these fluctuating explanations for the significance of the North Carolina move was real and substantial. For more than six months in 2020, the plaintiff had lived in Illinois, where the defendant likewise was not set up for payroll. (Doc. 1-2 at 1; Doc. 33-1 at 13). During her employment, the plaintiff was told that she could work from wherever she wanted. (Doc. 1-2 at 1). The plaintiff had been living in, and working from, Georgia since September 2021, with the full awareness and acquiescence of Perloff and Phelps, even though 90% of her clients were in Louisiana. (Doc. 33-1 at 12-13, 30, 34-36). Perloff testified that there was no legal impediment to the plaintiff continuing to write business in her assigned states of Florida, Mississippi, Alabama and Louisiana while living in North Carolina and that he could still supervise her work with her living there. (Doc. 33-2 at 3-4). The plaintiff informed Perloff and Phelps in advance of her anticipated move to North Carolina and, far from objecting, they worked with her on a plan of action to continue her probation in North Carolina. (Doc. 1-2 at 2). Because the defendant cites no evidence regarding the "burdens" it would incur with a move to North Carolina, its assertion of such burdens cannot be credited on motion for summary judgment.

The defendant denies much of the plaintiff's evidence and offers countering evidence as to some of it, but on motion for summary judgment the Court must credit the plaintiff's version. It would be open to the defendant to offer evidence and argument to reduce or eliminate the impact of the plaintiff's evidence, but it makes little effort to do so. The defendant does not, for example, attempt to distinguish the Illinois situation from the North Carolina situation regarding payroll issues. The defendant's main point is that, whatever Phelps and Perloff may have known and tolerated regarding either Georgia or North Carolina, neither human resources nor corporate had formally approved the plaintiff's moves to those states. (Doc. 30 at 5, 6, 12-13 ). The defendant posits that

18

company policy required such approval, (Doc. 39 at 7), but it neither offers evidence to substantiate its position nor explains how the plaintiff can be faulted for her superiors' failure to enforce any such policy.

The state of the evidence, for purposes of motion for summary judgment, may be synopsized as follows:

The plaintiff was employed as an underwriter for almost five years, without receiving any counseling, warning, or negative evaluation, other than a December 2021 probation based on low net revenue figures. She responded with by far the best numbers of her career, exceeding 99% of the expected minimum before beginning maternity leave in December 2022. Two weeks before she did so, the defendant proposed that she take a job elsewhere due to her maternal status, at the same denying any issue with her performance or job security. Nevertheless, about a week after returning from maternity leave, she was without warning placed on probation, purportedly for low net revenue numbers despite essentially meeting the expected minimum for 2022 and far exceeding her performance in earlier years. To make the case for low numbers, the defendant included the plaintiff's production for the two months when she was on maternity leave and not working. The terms of the February 2023 probation were markedly different from, and more severe than, the December 2021 probation imposed when the plaintiff's numbers were far lower.

Even though the probation was announced as month-to-month, the plaintiff was fired barely a week later -- approximately two weeks after returning from maternity leave and approximately one week after announcing she could not perform in-person agent visits because she was breastfeeding. At the time of her termination, the plaintiff's numbers for February exceeded the defendant's minimum requirements. The defendant says it fired the plaintiff due to a years-long history of low net revenue numbers, but it cannot explain why, if that were true, it would retain the plaintiff through years of "abysmal" numbers and then fire her when her numbers essentially matched what the defendant admits were the minimum to continue employment as a broker. Nor can the defendant explain why, if its articulated reason were its true reason, it would fire the

plaintiff only a week into her month-to-month probation, and even though her numbers then exceeded its minimum expectations.

The defendant cannot tell a consistent story about why it terminated the plaintiff. The plaintiff was initially told by Rodriguez that she was being fired because of her move to North Carolina. Before this Court, Rodriguez recants that story and explicitly denies that the plaintiff was fired for this reason. The defendant argues in its principal brief that the plaintiff was fired solely for her low net revenue figures, but in its reply brief insists that the plaintiff's North Carolina move was a second and independently sufficient reason to fire her.

The North Carolina story, besides being inconsistent with the defendant's solely-financial-performance story, and besides being repudiated as false by its own witness, is heavily undermined by the defendant's inability to tell a consistent story of why the move was problematic and its failure to support any of its various explanations with evidence, as well as by the plaintiff's evidence of the defendant's statements and conduct, at the time and on earlier occasions.

More could be said, but no more is necessary. The parties have presented abundant evidence of suspicious timing, ambiguous statements, pretextual justifications,[20] and more, all converging into a convincing mosaic of circumstantial evidence warranting an inference of intentional discrimination in the plaintiff's termination based on sex/pregnancy.[21] The defendant's motion for summary judgment as to this claim is due to be denied.

---

[20] Pretext may be shown by "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action." *Alvarez v. Royal Atlantic Developers, Inc.*, 610 F.3d 1253, 1265 (11th Cir. 2010) (internal quotes omitted). All of these abound on this record.

[21] Because the defendant relies only on its pregnancy discrimination discussion to challenge the sex discrimination claim, (Doc. 30 at 13-15), the Court does not discuss sex discrimination separately.

## II. Retaliation.

The complaint alleges that the defendant retaliated against the plaintiff for seeking and taking maternity leave by placing her on probation and by terminating her employment. The complaint alleges that the defendant retaliated against the plaintiff in connection with her breastfeeding by terminating her employment. (Doc. 1 at 11-13).

The defendant argues that retaliation claims must be analyzed under the burden-shifting *McDonnell Douglas* paradigm. (Doc. 30 at 15). However, as the plaintiff correctly notes, (Doc. 34 at 24), a plaintiff unable to satisfy that standard may still survive summary judgment under the convincing-mosaic paradigm. *Berry*, 84 F.4th at 1310-11. Under either method, to establish a claim of retaliation a plaintiff must show that she engaged in protected activity, that she suffered an adverse employment action, and that her protected activity was a but-for cause of the adverse action. *Vincent v. Jefferson County Board of Education*, 152 F.4th 1339, 1352 (11th Cir. 2025). The primary benefit to plaintiffs of the convincing-mosaic method is that they can potentially survive summary judgment without showing that the defendant's articulated legitimate, non-retaliatory reason for the adverse action is pretextual. *See Ismael*, 161 F.4th at 763 (once a plaintiff invokes the convincing-mosaic standard, "summary judgment should not be granted for failure to demonstrate pretext unless it also reflects a failure to put forward enough evidence for a jury to find for the plaintiff on the ultimate question of ... retaliation.") (internal quotes omitted).

In the Title VII retaliation context, an adverse employment action "is one that well might have dissuaded a reasonable worker" from engaging in protected activity. *Vincent*, 152 F.4th at 1353. A retaliatory action meeting that standard "is actionable whether or not the mistreatment rises to the level of a tangible employment action." *Monaghan v. Worldpay US, Inc*., 955 F.3d 855, 861 (11th Cir. 2020). The defendant makes no argument that termination and probation are not adverse actions capable of supporting a retaliation claim.

The defendant does argue -- without citing any evidence, legal principle, or precedent -- that the plaintiff engaged in no protected activity because "she never ...

request[ed] an accommodation." (Doc. 30 at 15). The plaintiff says that maternity leave is a reasonable accommodation and that she specifically requested such leave. (Doc. 34 at 22).[22] The plaintiff says that the taking of maternity leave is also protected activity. (*Id*. at 23).[23] The defendant responds only with the correct but inapposite observation that "the *granting* of maternity leave cannot itself serve as protected activity." (Doc. 39 at 22 (emphasis added)). On this slim record and argument, the defendant has not carried its initial burden on motion for summary judgment with respect to the requesting and taking of maternity leave.

With respect to breastfeeding, the cited evidence reflects that the plaintiff never spoke with anyone in human resources about breastfeeding and never requested from human resources any type of accommodation for breastfeeding. (Doc. 31-4 at 3, ¶ 30). However, the evidence is also that, when the plaintiff learned that she was supposed to visit agents while on probation, she immediately called Perloff and told him "that was going to be an issue because at the time I was exclusively breastfeeding." Perloff responded that, "since you can't go physically visit agents right now, just be sure to pick up the phone and be in their face." (Doc. 33-1 at 21-22). The defendant ignores this testimony, focusing instead on the plaintiff's confirmation that it is "correct" that she "never requested any kind of accommodation at the workplace for lactation." (*Id*. at 22). All this testimony establishes is that the plaintiff never requested to be accommodated "at the workplace," presumably (or, at least, reasonably) meaning, the Mobile office (as by, for instance, a dedicated private nursing station). The defendant has shown neither that the plaintiff admitted never seeking an accommodation regarding visiting agents nor that her conversation with Perloff did not constitute a legally sufficient request for such accommodation.

_____

[22] *Cf. Jiminez*, 146 F.4th at 999 ("A request for a reasonable accommodation is a protected activity" in the context of a federal employee's Title VII retaliation claim); *Pereda v. Brookdale Senior Living Communities, Inc*., 666 F.3d 1269, 1276 (11th Cir. 2012) (a request for maternity leave is protected activity under the Family and Medical Leave Act ("FMLA")).

[23] *Cf. Jones v. Gulf Coast Health Care, LLC*, 854 F.3d 1261, 1271 (11th Cir. 2017) (taking FMLA leave is protected activity).

That leaves causal relation between protected activity and adverse action.  The plaintiff was placed on probation only about one week after returning from maternity leave,[24] and she was terminated only about one week after that (which was about one week after talking with Perloff about breastfeeding).  Close temporal proximity between protected activity and adverse action is evidence of causal relation, and periods of a week to a month fall within this general rule.  *Patterson v. Georgia Pacific, LLC*, 38 F.4th 1336, 1352 (11th Cir. 2022).  The defendant relies on the same arguments regarding innocent explanations for its actions as it raised with respect to the plaintiff's discrimination claim, (Doc. 30 at 16), and they strengthen rather than weaken the plaintiff's case for reasons exhaustively discussed in Part I.

Whether analyzed under the burden-shifting paradigm or the convincing mosaic standard, the defendant's motion for summary judgment as to the retaliation claim is due to be denied in its entirety.

### III.  Failure to Accommodate.

In a scant six lines, the defendant argues that this claim fails because:  (1) the plaintiff made no request to accommodate her breastfeeding; (2) the defendant did not deny any such request but instead gave the plaintiff "flexibility to manage her own schedule following her return from maternity leave"; and (3) the defendant did not treat the plaintiff "less favorably than non-pregnant employees with comparable work limitations."  (Doc. 30 at 16).

As discussed in Part II, the defendant has not met its burden on motion for summary judgment with respect to the absence of a request to accommodate the plaintiff's breastfeeding.  The defendant's only evidence in support of its second argument is that the plaintiff agreed she was "never present at that office when [she was] breastfeeding."  (Doc. 33-1 at 22).  Assuming without deciding that the plaintiff's absence

---

[24] For purposes of temporal proximity, the key date is the last day of leave, not the first. *Jones*, 854 F.3d at 1272.

from the Mobile office during the brief interval she was employed after maternity leave was the result of Perloff's permission to contact agents remotely, any such accommodation obviously ended along with her termination.  The defendant's third argument assumes that a failure-to-accommodate claim requires proof that other persons were treated more favorably, but it fails to cite any law for that proposition.  In any event, the defendant has not met its initial burden on motion for summary judgment, since it neither negates the existence of such persons (as by a representative's testimony that none exist) nor points to materials on file showing that the plaintiff can produce no evidence of such a person (as by unamended discovery responses denying the plaintiff's awareness of such a person).

## CONCLUSION

For the reasons set forth above, the defendant's motion for summary judgment is **denied**.

DONE and ORDERED this 12th day of February, 2026.

s/ WILLIAM H. STEELE
UNITED STATES DISTRICT JUDGE